THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. 2:09CR00926 DS |
| Plaintiff, | ) | |
| vs. | ) | |
| ANDREAS GAVILANAS-MEDRANO, | ) | MEMORANDUM DECISION AND ORDER ADDRESSING MOTION TO SUPPRESS EVIDENCE |
| Defendant. | ) | |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

## I. INTRODUCTION

Defendant Andreas Gavilanas-Medrano has moved to suppress evidence seized from the search of his car on October 16, 2009, in connection with a traffic stop, along with incriminating statements elicited from police officers. An evidentiary hearing was held, followed by post trial briefing which was completed on September 10, 2010.

These are the relevant facts. On October 16, 2009, Kyle Kenneth Shelley, a Provo, Utah, Police Officer assigned to the Utah County Major Crimes Task Force, and Detective Sergeant Ruiz, received information from a confidential informant ("CI") that a grayish-silver Honda Accord or Civic, with a distinctive off-color blue bumper, possibly would be carrying narcotics and traveling northbound on I-15 on the following morning. Officers Shelley had dealt with the CI previously and had experienced numerous successful prosecutions because of the CI. He had found the CI to

be truthful and accurate in the past. The CI stated that the drugs in the vehicle would be very well concealed and probably would not be found by police. Based on the information received from the CI, Officer Shelly was watching I-15 in Payson, Utah, on October 17, 2009, looking for the vehicle described. When he saw the vehicle, as previously arranged he contacted Utah County Sheriff's Deputy Shalen Nielson, who had expertise in narcotics detection, to catch up to the vehicle and observe it for traffic violations. In the patrol car with Deputy Nielson was Vito, his certified drug dog, and Utah County Sheriff's Deputy Crawford.

Deputy Nielson observed the vehicle commit two traffic violations, following too closely to the vehicle in front of it, and changing lanes without signaling. After he turned on his overhead lights to initiate a traffic stop of the vehicle, the vehicle was slow to pull over taking over a mile to come to a stop. Initially, officers thought there was only one person in the vehicle. But after the overhead lights were activated, an individual in the passenger seat sat up. The passenger would sit up, look around the vehicle, then look back at the officer's vehicle making furtive movements in the vehicle, then ducking down where the officers could not see him. He would stay down for several seconds, then sit up again.

After the vehicle stopped, Deputy Nielson and Deputy Crawford approached the car. The driver, who spoke Spanish, identified

himself as Mr. Gavilanas, the Defendant. Deputy Nielson, who speaks very little Spanish, asked for Defendant's driver's license, insurance and registration. Defendant provided a Mexican driver's license and a Utah registration for the vehicle in his name and proof of insurance. The passenger offered a Mexican identification card. Deputy Nielson told them to wait and he went back to his vehicle to check identifications.

Deputy Nielson spoke with Officer Shelley and was told that Leslie Derewonko, a Spanish speaking agent with Immigration and Customs Enforcement ("ICE") would come and assist him in communication with the vehicles' occupants.

While waiting for Agent Derewonko, Deputy Nielson intended to run his drug dog Vito around the exterior of Defendant's vehicle. He asked Defendant if there was anything illegal in the vehicle and was told no, but Defendant was very nervous and repeatedly asked if he could leave. Both Defendant and his passenger were asked to exit the vehicle for officer safety reasons. As the passenger exited, he left his door to the vehicle open. Both individuals stood by Deputy Nielson's vehicle while Vito went around Defendant's vehicle. Defendant appeared nervous and scared and kept asking over and over if he could leave.

Vito moved around Defendant's car starting at the rear bumper until he got to the front driver's side door where he stopped, sniffed back and forth more intently and then up and down the

bottom door seam.  Deputy Nielson recognized this as an alert. Vito continue his sniff along the front of Defendant's car until he reached the passenger door.  Vito sniffed up and down the seam more intently than he normally had.  Deputy Nielson recognized this as yet another alert for the presence of narcotics.  Vito then stood up on his hind legs with his paws up on the vehicle and began sniffing up the front door seam onto the hood of the vehicle, and sniffed the intersection of the windshield and the hood of the car. Deputy Nielson recognized this as another alert.  Vito then continued to the open side passenger door, sniffing along the seam and began sniffing again more intently up the front seam as well as underneath the dash.  At this time Vito was outside the car, but sticking his nose into the dashboard area and floorboard of the passenger side door which had been left open.  Vito then jumped into the car sniffing and went immediately to the back seat, and began sniffing more intently on a black garbage bag.  He was scratching and pawing trying to get underneath the bag.  Deputy Nielson recognized this scratching and biting as Vito signaling a source of the drug.  Deputy Nielson pulled Vito out of the car and officers began a search.  A marijuana joint or roach was found in the back seat.

Based on information then known, a search warrant was obtained and the car was searched further.  Under the hood, where Vito had

alerted, a black canister filter that had new screw heads and fresh markings, was found containing methamphetamine.

Provo City Police officer Jerid Barney arrived after Vito had alerted, but before the search. He told Defendant that Vito had alerted on the car and asked Defendant if had any drugs in the car, to which Defendant said no, check it. Officer Barney, assisting in the search, found the marijuana joint in the back seat.

ICE Agent Derewonko arrived after the dog sniff to assist as an interpreter. He identified himself to Defendant, who told him he was in the United States illegally, which Agent Derewonko confirmed with dispatch. Agent Derewonko assisted as interpreter while Defendant was questioned regarding where he was coming from and where he was going. When Agent Derewonko learned that marijuana had been found, he inquired of Deputy Shelly about it and was requested by Deputy Shelley to give Defendant his Miranda rights in Spanish. Agent Derewonko testified that Defendant responded that he understood his rights and asked what was going to happen to his car.

Defendant was subsequently transported to jail where he made further statements to Officer Barney, who stated that the interview was done with the knowledge that Defendant had already been advised of his Miranda rights.

## II. DISCUSSION

### A. Legality of Stop, Detention and Search

Defendant urges that evidence of drugs found in his car should be suppressed "because it is the fruit of an unlawful detention and an unlawful search. The detention was unlawful because Officer Nielson did not have reasonable suspicion that Mr. Gavilanas possessed drugs. The search was unlawful because officer Nielson did not have probable cause to let Vito enter the car." Mem. Supp. at 6.

"A routine traffic stop constitutes an investigative detention and is examined under the principles announced in *Terry v. Ohio*, 392 U.S. 1, 19-20 ... (1968)". *United States v. Williams*, 403 F. 3d 1203, 1206 (10th Cir. 2005). The court makes a two step inquiry when addressing the constitutionality of an investigative stop. The first inquiry is "whether the stop was justified at its inception." *Id*. A traffic stop for an observed traffic violation is valid under the Fourth Amendment. *Id*. The second inquiry is "whether the officer's conduct during the detention was reasonably related in scope to the circumstances which justified the initial stop." *Id*. A motorist may be detained for questioning unrelated to the initial traffic stop if the officer has "an objectively reasonable and articulable suspicion that illegal activity has occurred". *Id*. "If a police-citizen encounter exceeds the limits of a *Terry* stop, the detention becomes an arrest that must be

6

supported by probable cause." *United States v. Neff*, 300 F.3d 1217, 1220 (10th Cir. 2002).

### 1. Initial Stop

"A traffic stop is justified at its inception if an officer has (1)probable cause to believe a traffic violation has occurred, or (2)a reasonable articulable suspicion that a particular motorist has violated any of the traffic or equipment regulations of the jurisdiction." *United States v. Winder*, 557 F.3d 1129, 1134 (10th Cir.), *cert. denied*, 129 S. Ct. 2881 (2009). The officer's subjective motives are irrelevant and the Court examines only whether the stop was objectively justified. *United States v. White*, 584 F.3d 935, 945 (10th Cir. 2009), *cert. denied*, 130 S. Ct. 1721 (2010).

During a routine traffic stop, an officer may request a driver's license, registration, and other required papers, run requisite computer checks, and issue citations or warnings. *United States v. Williams*, 271 F.3d 1262, 1267-68 (10th Cir. 2001). And an officer may ask questions unrelated to the reason for the stop as long as the questioning does not extend the length of the detention. *United States v. Alcaraz-Arellano*, 441 F.3d 1252, 1258 (10th Cir. 2006).

It is un-controverted that Defendant committed two traffic violations justifying the initial stop of his car.

**2. Scope of the Stop**

"'[A] lawful traffic stop must be reasonably related in scope to the circumstances which justified the interference in the first place. A seizure that is justified solely by the interest in issuing a [traffic ticker] ... may become unlawful if it is prolonged beyond the time reasonably required to complete that mission.'" *White*, 584 F.3d at 949 (quoting *United States v. Lyons*, 510 F.3d 1225, 1236 (10th cir. 2007)).

However, "'[t]he traffic stop may be expanded beyond its original purpose if during the initial stop the detaining officer acquires reasonable suspicion of criminal activity, that is to say the officer must acquire a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *Id.* (quoting *United States v. Clarkson*, 551 F.3d 1196, 1201 (10th Cir. 2009)). The Court considers the totality of the circumstances in deciding whether an officer had acquired reasonable suspicion of other criminal activity. *Id*. at 950. "'[T]he level of suspicion required for reasonable suspicion is considerably less than proof by a preponderance of the evidence or that required for probable cause.'" *Id* (quoting *United States v. DeJear*, 552 F.3d 1196, 1200 (10th Cir.), *cert. denied*, 129 S. Ct. 2418 (2009)). And a factor that by itself is not proof of illegal conduct and is consistent with innocent travel, may nevertheless raise objectively reasonable suspicions. *Id*. However, "'unparticularized hunches'

based on indicators 'so innocent or susceptible to varying interpretations as to be innocuous' cannot justify a prolonged traffic stop or vehicle search." *Id*. (citation omitted). "The allowable scope of an investigative detention cannot be determined by reference to a bright-line rule; '"common sense and ordinary human experience must govern over rigid criteria.'" *United States v. Neff*, 300 F. 3d at 1220 (quoting *United States v. Sharpe*, 470 U.S. 675 (1985)).

Based on the evidence presented, the Court rejects Defendant's position that continued detention was unlawful, and concludes that the Officers' conduct did not exceed the scope of a legal *Terry* stop. Extension of the stop was permissible because officers had reasonable suspicion that Defendant was involved in criminal activity. Defendant's failure to respond to the officer's overhead lights by pulling his car over at once, his general nervousness, the furtive movements of the passenger, together with specific information from a known reliable CI about illegal drugs being carried in a Honda with a unique off-color blue bumper, that matched Defendant's vehicle, provided officers with an objectively reasonable suspicion that Defendant was involved in criminal drug trafficking activity to warrant further detention.

Extension of the stop was also permissible to await the arrival of a Spanish speaking officer to assist in communications with Defendant. As part of the traffic stop, Officers properly

9

requested that Defendant produce his driver's license, proof of registration, and proof of insurance. *United States v. Holt*, 264 F.3d 1215, 1220-1222 (10th Cir. 2001). Defendant had a Mexican driver's license, but the car was registered to him in Utah. He did not speak English. Deputy Nielson testified that he knows a enough Spanish to ask for identification or registration, but he does not speak Spanish. "An officer who experiences linguistic barriers communicating with an occupant of a vehicle during a traffic stop may briefly extend the stop pending arrival of another officer who is able to bridge the communication gap." *United States v. Vicuna*, No. 09-0238, 2010 WL 1337515, at *7 (W.D. La. Feb. 22, 2010), *Report and Recommendation Adopted by*, 2010 WL 1251491 (Mar. 30, 2010),(citing *United States v. Ruiz*, 412 F.3d 871, 880 (8th Cir. 2005); *United States v. Pasillas-Castanon*, 2007 WL 433391 (N.D. Okla. Feb. 5, 2007); *United States v. $189,825.00 in U.S. Currency*, 8 F. Supp.2d 1300, 1309 (N.D. Okla. 1998)). *See also, United States v. Martinez*, 983 F.2d 968 (10th Cir. 1992), cert. denied, 508 U.S. 922 (1993),(police justified in delaying routine traffic stop awaiting arrival of Spanish speaking officer to assist with communications to determine whether stopped vehicle was stolen). Under the circumstances, a brief extension of the stop to await arrival of Agent Derewonko to act as interpreter was permissible.

Neither was the scope of the stop improperly extended, as Defendant urges, to have Vito sniff the car for drugs. Because Deputy Nielson had a certified drug dog with him in his patrol car, the time to do a canine sniff around the exterior of Defendant's car was minimal, and occurred while waiting for Agent Derewonko of ICE to arrive and assist as interpreter. Therefore, Defendant's Forth Amendment rights were not infringed by Vito performing a drug sniff on the exterior of the vehicle. *See Illinois v. Caballes*, 543 U.S. 405, 408 (2005)(holding that where officers did not extend the time necessary to resolve a lawful traffic stop, the arrival of another officer to the scene of a traffic stop in progress and that officer's use of a drug dog to sniff around the exterior of the car did not infringe the motorist's fourth Amendment rights); *United States v. Hunnicutt*, 135 F.3d 1345, 1350 (10th Cir. 1998)("[a] canine sniff itself does not implicate Fourth Amendment rights because of the limited information it provides and its minimal intrusiveness", thus, "a canine sniff of an already legitimately detained automobile is not a 'search' within the meaning of the fourth Amendment").

3. **Legality of Vehicle Search**

Probable cause can be based on alerts of trained or reliable drug dogs. *United States v. Clarkson*, 551 F.3d 1196,1203 (10th Cir. 2009). Defendant challenges whether Vito's observed behavior constituted an alert for purposes of probable cause. He appears to

cite *United States v. Parada*, 577 F.3d 1275 (10th Cir. 2009), *cert. denied*, 130 S. Ct. 3321 (2010), for the proposition that to be valid, a drug dog must alert in some standardized way similar to behavior described by the dog's partner in that case. The Court does not read *Parada* as support for that proposition, and it is rejected.

In any event, Deputy Nielson testified that an alert for Vito is reflected by a change in the dog's behavior recognizable to him such as stopping, sniffing more intently, a change of attitude and behavior reflecting that he was indeed smelling the odor of drugs. In the Court's view, Vito's behavior is not unlike that described in *Parada*, 577 F.3d at 1281( dog "alerts by an increased rapid deep breathing, body stiffening, and upbreaking from the search pattern"), and *United States v. Forbes*, 528 F.3d 1273, 1276 (10th Cir.), *cert. denied*, 129 S. Ct. 477 (2008),(dog alerts "by changing its body posture and by increasing its respiration").

Defendant also asserts that "although Vito was certified at the time, it is not clear that he is a reliable indicator that a car has drugs at the time of his sniff." Mem. Supp. at 17. The "party seeking to suppress evidence bears the burden of proving the dog is unqualified". *United States v. Clarkson*, 551 F.3d 1196, 1203 (10th Cir. 2009).

12

The United States has submitted evidence of Vito's training and certification process which demonstrates a history of reliability. However, Defendant contends:

> According to our review of the 197 search records [relating to Vito] provided, it appears Vito engaged in an actual search on approximately 115 occasions. In 51 of these searches, he made no alert or indication. 32 time he found drugs, and 10 times he alerted, but officers learned drugs had recently been in the area where Vito alerted. On 19 separate occasions, Vito alerted or indicated to the presence of drugs but none were found. Given this high number of false positives, the court should conclude that, notwithstanding Vito's certification, he is not a reliable indicator of the presence of drugs.

Reply Mem. at 13. Based on Defendant's stated review of the record, Vito has an accuracy record of approximately 84%. As to the approximately 16% of presumed false alerts, there is no basis to conclude that those alerts were false. As with alerts where drugs were not found, but officers learned that drugs had been in the area where Vito alerted, it cannot be concluded that unknown to police and ,therefore unrecorded, that drugs at some past time were not present. The statistic suggests only that drugs were not found, not that Vito's alert was erroneous. In sum, Defendant has not met his burden of proving that Vito is unqualified.

A trained drug dog's alert for the presence of drugs establishes probable cause. *Clarkson*, 551 F.3d at 1203. Vito's alert to the exterior of Defendant's car was sufficient to give officers probable cause to search defendant's car.

13

The Court agrees with the United States that it is unnecessary to determine if Vito's jump into the open passenger door of Defendant's car was instinctive, as found in *United States v. Stone,* 866 F.2d 359 (10th Cir. 1989), because Vito had already alerted to the presence of drugs while he was on the exterior of the car.

**B. Defendants's Custodial Statements**

Defendant also contends that his statements "made later at the jail should be suppressed as fruits of these violations [as discussed above], as well as [for] the independent ground that they were made without a valid waiver of *Miranda*." Mem. Supp. at 6. Having addressed Defendant's earlier violations, his "fruits of these violations" position is moot and rejected as such.

Defendant was interviewed later that day in jail by Officer Barney, who did not then give a *Miranda* warning to Defendant because Agent Derewonko had given it to him at the site of the traffic stop before Defendant was taken to jail. It is undisputed that Defendant received a *Miranda* warning at the site of the traffic stop. Defendant, however, contends that because he was not in custody when he was given his *Miranda* warning, it was of no avail. He asserts, without citation to authority, that "[a] warning given before a person is taken into custody cannot offset the inherently coercive environment of a future custodial interrogation. In order to be valid, the defendant must be warned

14

after he has been taken into custody and prior to any interrogation. Because [Defendant] was not 'in custody' at the time he was warned, the warning is invalid as to his later custodial interrogation." Mem. Supp. at 23. He also asserts that it is not clear from the record whether Defendant waived his rights at that time.

Defendant's position is rejected. "The *Miranda* Court formulated a warning that must be given to suspects before they can be subjected to custodial interrogation." *Berghuis v. Thompkins*, 130 S. Ct. 2250, 2259 (2010). While custody triggers the need to give *Miranda* warnings, such warning is not invalid merely because the suspect is not yet in custody. Substantially the same position as Defendant asserts here was rejected in *Mitchell v. Gibson*, 262 F.3d 1036, 10th Cit. 2001), where the defendant was given a *Miranda* warning prior to being placed in custody. There the court stated:

> [Defendant] argues that the *Miranda* warnings given here were ineffectual in view of the lengthy period between the time they were given and the point at which he was actually told he was in custody. He asserts that the officers who conducted the interview did not promptly place him in custody after identifying him as a likely suspect and that the delay in custodial interrogation minimized the effect of the previously given warnings. We are not convinced. Numerous courts have rejected the argument that the passage of time alone invalidates previously given *Miranda* warnings. "The mere passage of time does not compromise a *Miranda* warning. Courts have consistently upheld the integrity of *Miranda* warnings even in cases where 'several hours' have elapsed between the reading of the warning and * the interrogation." ... In *United States v. Andaverde*, 64 F.3d 1305, 1313 (9th

15

> Cir. 1995), for example, the court determined that new warnings were not required when the defendant was interviewed the day after the warnings had been given.

*Id*. at 1057. Agent Derewonko's giving of the *Miranda* warning at the site of the traffic stop, even if there was no current custodial interrogation taking place, sufficiently alerted Defendant to his rights and protected those rights when Defendant was interviewed later that day at the jail.

The evidence reflects that Defendant understood his *Miranda* rights, which were given to him in Spanish. Agent Derewonko testified that when he asked Defendant if he understood his rights, Defendant responded in the affirmative. He then subsequently spoke with officers and gave statements, without invoking his rights under *Miranda*. There is no evidence or suggestion that those statements were coerced. Based on these circumstances, Defendant waived his Miranda rights and his statements should not be suppressed. *See Berghuis v. Thompkins,* 130 S. Ct. 2250, 2262 (2010)("[w]here the prosecution shows that a *Miranda* warning was given and that it was understood by the accused, an accused's uncoerced statement establish an implied waiver of the right to remain silent").

## III. CONCLUSION

For the reasons set forth[1], Mr. Gavilanas' Motion to Suppress (Doc. #14) is denied.

IT IS SO ORDERED.

DATED this 28th day of September, 2010.

BY THE COURT:

*David Sam*

DAVID SAM
SENIOR JUDGE
UNITED STATES DISTRICT COURT

---

[1] Having found Defendant's Motion to be without merit, the Court does not consider the Government's responsive arguments that Defendant gave permission for the search of his vehicle, or that the good faith exception to the exclusionary rule applies.

17